No. 2639.

JAMES TILLERY *v*. THE STATE.

1. MURDER—SELF DEFENSE—CHARGE OF THE COURT.—The evidence on a murder trial disclosed that for a period long anterior to the homicide the deceased was at enmity with the accused; that he had repeatedly, without apparent probable or reasonable cause, charged the accused with a felony; that he had threatened to kill the accused; that he had conspired with one T. to kill the accused, and that, at the time of the homicide, he was acting together with T. in pursuance and furtherance of said conspiracy; that he and T. made an unsuccessful attempt on the night before the homicide to induce other parties to co-operate with them in the murder of the accused on that night, of which effort on the part of the deceased and T. the accused, on the same night, was informed; that on the next morning, immediately after a conference with T., the deceased, armed with a pistol, accosted the accused and again charged him with the felony; that the accused thereupon demanded that the charge be retracted by the deceased, when the deceased placed his right hand to his right side (where his pistol was afterward found), and the accused fired the fatal shot. *Held*, that the evidence fairly raised the issue of self defense, and authorized the court to charge the jury upon that issue; but that, as there was no evidence tending to show that the accused had forfeited his right of self defense by seeking and provoking the difficulty, the charge upon that issue was not authorized by the proof, was prejudicial to the accused, and was, therefore, erroneous.

2. SAME.—The rule prescribing the extent to which a person in emergency is authorized to act upon appearances of danger is as follows: If, from the standpoint of the slayer, it reasonably appeared to him, from the cir-

cumstances of the case, that the danger existed, and he acted under the reasonable belief that it did exist, he was justified in defending against it to the same extent, and under the same rules, as if the danger had been real. The charge in this case was erroneous, in that it limited such right of the accused to his *honest belief* that he was in danger, and erroneously made this idea prominent by reiteration.

3. SAME—THREATS.—The charge of the court is otherwise erroneous in that the instruction relating to the threats uttered by the deceased against the accused is disconnected from that portion of the charge which relates to self defense, whereas it should have formed a part of the instruction on the law of self defense, and should have been given in immediate connection with that issue. See the opinion in extenso on the subject.

4. PRACTICE—EVIDENCE.—It was competent for the accused to prove that the deceased had no probable cause to charge him with felony, and did not believe the charge to be true when he made it, but such proof could not be made by the statement of a witness that he investigated the charge of felony made by the deceased against the accused and discovered no evidence to support it, such statement being merely the conclusion of the witness.

5. SAME.—The defense in this case proposed to prove the declarations of T., the co-conspirator of the deceased, made subsequent to the homicide. *Held*, that the proposed proof was properly excluded, it being but hearsay, and not part of the *res gestæ*, nor admissible under the rule that the declarations of one conspirator, pending the conspiracy, are admissible against the other.

6. SAME—PRIVILEGE OF COUNSEL —The evidence disclosing the complicity of T. with deceased in a conspiracy to kill the accused, denunciation of T. by counsel for the defense did not constitute a breach of the privilege of argument, but was authorized by the facts in proof. Such denunciation of T. could not warrant the prosecuting counsel to abandon the record in the case, and on his personal knowledge review T.'s connection with two subsequent homicides, in the first of which he was the slayer, and in the latter the slain, and both of which were wholly foreign to the case on trial.

APPEAL from the district court of Harrison. Tried below before the Hon. J. G. Hazlewood.

The indictment in this case was filed in the district court of Gregg county, Texas, on the twenty-third day of January, 1885. It charged the appellant with the murder of J. N. Allison, in said Gregg county, Texas, on the eleventh day of November, 1884. The venue of the case was changed to Harrison county, and at the August term, 1887, of the district court of the said Harrison county, the appellant was placed upon his trial, which resulted in his conviction of manslaughter, his punishment being assessed at a term of two years and six months in the penitentiary.

William Reddick was the first witness for the State. He testified that he lived in the town of Longview, Gregg county, Texas. He had known the defendant about fourteen years, and, at the time of the death of Doctor Allison, had known him about nineteen years. The witness was in the town of Longview on the day that Doctor Allison was killed, but did not see the difficulty in which Allison was killed. He knew that a very bad state of feeling existed between the defendant and Allison, at the time of the latter's death. The witness had a conversation with the defendant on the Saturday night succeeding the election in November, 1884. In that conversation the defendant told witness that, having heard that Allison had accused him, defendant, of burning his, Allison's, store house, and had said that he, defendant, was not worthy to be looked upon as a gentleman, he approached Allison on election day, and asked him why he had made the statements referred to. He said that Allison refused to talk to him, and that he thereupon seized Allison's whiskers, and told him to stop, or that he would kill him; that he, defendant, was not guilty of burning the house, and that he would not rest under such an accusation; that Allison then said to him that it was no time to have a difficulty, but that he would see him, defendant, at another time. The defendant at one time occupied Allison's store house as a grocery merchant, but had sold out at the time the said house was burned. After the burning of the store house, Doctor Allison lost a stable or barn by fire.

Cross examined, the witness said that the conversation above referred to occurred at the "jollification meeting" on the public square in Longview, which was held on Saturday night succeeding the presidential election of 1884. In connection with the statements above set out, the defendant said that he had met Doctor Allison on the streets since that Saturday night, but that Allison did not speak to him. About two months before the homicide, Doctor Allison sent witness word to go to his, Allison's, drug store on a particular evening at four o'clock. When witness reached the drug store, Allison said that he was busy, and asked witness to return at eight o'clock. The witness did so, and from the drug store went with Allison to a room over Crutcher & Harrison's store. They reached that room between nine and ten o'clock. Those present at the meeting were Doctor Allison, George Tabler, William Butt, W. T. Whitelock, John Mattox, John Jennings, W. A. Abey, W. R. Bass and witness. Witness re-

mained in that room only about ten minutes. The parties wanted witness to subscribe to an obligation to keep secret the proceedings of the body, and to defend the life and property of each member. Witness declined, saying that he would defend a friend's life and property without being oath-bound, but would not defend everybody. The conclave adjourned to meet on the next night, and asked witness to meet with them, but witness declined and did not attend the meeting. Several houses had been recently burned, and a great deal of petty stealing had been going on for some time. Allison's store was burned in January, 1884. The sheriff, the constable and the city marshal of Longview were good and efficient officers, and had efficient deputies.

John Jennings testified, for the State, that an organization to suppress prevailing crime was organized in Longview a short time before the killing of Doctor Allison. The witness was at Allison's house on the night before the homicide. The parties present on that occasion were Doctor Allison, George Tabler, John Mattox, W. T. Whitelock and witness. They adjourned that night to meet at ten o'clock next day at the opera house. The business men of Longview manifested but little interest in the said organization. There were meetings of that body held which the witness did not attend.

J. F. Harrison testified, for the State, that he saw the difficulty which resulted in the killing of Doctor Allison by the defendant. The killing occurred at about seven o'clock in the morning. The witness was on the street railway track, nearly in front of the telephone office, when the shooting occurred. Defendant was very near the witness, riding towards him, when witness first saw him. Doctor Allison rode up behind defendant, and when he got at defendant's side, or, perhaps, slightly ahead of defendant, the defendant extended his hand and fired two shots in quick succession. Allison's horse then turned towards Allison's place of business. Defendant's horse stopped on the street railway track, when both witness and defendant looked at Allison. When Allison fell, defendant turned the pony he was riding and fled, whipping his pony with his hat. Defendant and Allison had passed Allison's burned corner but a short distance when the killing occurred.

On his cross examination the witness testified that when he first observed the defendant the latter was on his pony, standing at or very near the place where the shooting occurred. About that time Allison rode around the burned corner, approached

defendant from behind, and about the time he reached the defendant both of them started their horses, riding towards the witness. The shooting occurred at once. Witness could not remember what directed his attention to the parties, but he was going towards them, and did not stop until the shooting occurred. At the time that the fatal shots were fired, Allison was looking towards the witness, defendant was looking at Allison, and witness was looking at defendant and Allison. Witness thought his present testimony was the same as that he gave on the habeas corpus trial of the defendant. He would say now that, while it was possible that Allison was looking at the defendant at the time that the shots were fired, it was a very singular look. The horses of both Allison and the defendant were moving in a very slow walk when the shots were fired. The witness could not now describe the position in which Allison held either of his hands at the time of the shooting. Upon reflection the witness was constrained to admit that the shooting first attracted, his attention particularly to the parties, but he saw them before the shooting. The shooting occurred about thirty steps north of the telephone office, which was in the second story of the Boring & Kennard building. Had the parties kept on in the direction they were going, they would have crossed the street railroad track, missing the Boring & Kennard building about five feet. They were moving to the right, in the direction that the defendant was traveling. Allison fell from his horse nearly in front of his drug store. That drug store was on the north side of Tyler avenue, and was the house now occupied by Rembert as a dry goods store, as shown on the diagram of Longview now exhibited to witness. Witness did not belong to, nor had he at that time heard of the existence of, a vigilance committee in Longview. Witness owned considerable property in Longview at the time of the killing of Allison.

W. T. Butt testified, for the State, that he witnessed the shooting of Allison by the defendant. The witness's store was that marked "Butt & Tankersly" on the diagram. It was on the same street and on the same side that Allison's drug store was on, about seven store houses intervening. Witness was standing in front of his store, about twenty or thirty steps from the defendant and Allison at the time that the fatal shots were fired. Allison came into the street behind the defendant, and, just as he got to defendant's side, defendant pulled his pistol, hung it down by his side, reined his horse towards Allison, and then

raised his hand and fired, and then fled. When the witness first saw Allison and defendant they were west of him. They were to the right and east of witness when the killing took place. Allison was riding somewhat faster than defendant. He was looking at defendant, with his head careened towards defendant, when the shots were fired. On his cross examination the witness said that Allison overtook defendant after passing witness. Defendant was riding his pony in a slow walk. Allison was pacing his horse towards his place of business.

Doctor R. B. Hamilton, for the State, described the wounds inflicted upon the body of the deceased, both of which entered from the right side, and one of them perforated the heart. On his cross examination he said that he saw a Smith & Wesson improved pistol, just after the shooting, which was said to have been taken from the body of the deceased after his fall.

The material fact testified to by F. P. Hamill was that just after the removal of the deceased to his room he saw W. P. Stannart remove a pistol from deceased's person. It had been carried on his right side, between the waistband of the pants and the body.

Deputy Sheriff Pleasant Cocke was the next witness for the State. He testified that he saw the killing of Allison by the defendant. When he first saw the parties, just before the shooting, they were coming down the street running east and west, one of the parties, witness did not remember which, riding a little in advance of the other. They turned the corner at Allison's burned store, and went east up Tyler avenue. At that time they appeared to be riding together. They angled to the right and rode in that direction a short distance. Tillery then turned his horse to the left, rode up near to Allison and shot him. It was the recollection of the witness that defendant held his pistol a short space of time after he drew it before shooting. The shooting occurred on the north side of the street railway track, Allison, at the time, being next to the north sidewalk. Witness was immediately behind the parties, between the public well and Mayfield & Luckett's corner, as shown on the diagram. Tyler avenue was about one hundred feet wide. The street railway passed over it about the center. The witness saw no demonstration of any kind on the part of Allison. Witness, however, was looking at Tillery. He had been searching for Tillery all that morning to arrest him on a charge of carrying a pistol. The fatal shots were fired at a point in front of

Jennings & Schmidt's store. The witness mounted Allison's horse and followed defendant, but defendant, having the start, outran witness. At a point about three-quarters of a mile from town the defendant abandoned his horse and fled into the woods. Witness did not again see the defendant until February, 1885.

Cross examined, the witness said that he first saw Allison and defendant coming down the street in front of McCord's residence. One or the other, witness did not know which, was then in advance. Allison turned his face to the defendant soon after they turned into Tyler avenue. The witness could not say what, if any, particular thing, Allison was doing at the moment the shots were fired. Witness did not see that Allison turned his body in the saddle at the moment the shots were fired. The plat of the town of Longview (which follows in this report) was here exhibited to the witness, and was pronounced correct. Judge Kilgore's residence could not be seen from Allison's residence, because of the obstruction to the view caused by the Presbyterian church. Allison's residence and his drug store were about two hundred and fifty yards apart. The witness had been a deputy sheriff since 1883. He never heard of the existence of a vigilance committee in Longview until after the killing of Allison. He did not know who, if anybody, belonged to such committee. After returning from the pursuit of defendant, witness met George Tabler and others on horseback.

The State closed its evidence with the plat of the town of Longview, referred to by this and the previous witnesses, and which follows:

Statement of the case.

Charles Leet was the first witness for the defense. He testified that he was employed as clerk in Doctor Allison's drug store, in November, 1884, and was engaged in that store at the time of the killing. Allison came into the drug store, on the fatal morning, a few minutes after the witness opened. He remained but a few minutes, telling witness that he was going out to his farm, and to tell any one who might inquire for him that he would be back by noon. Before leaving, Doctor Allison went to the telephone and called for some one; the witness, paying no attention to the call, could not say who. George Tabler soon came to the drug store, and he and Allison retired through the back door of the drug store and held a short private conversation. Witness did not hear any part of their conversation. Allison came back into the store about five minutes before Tabler did. Allison soon left, but witness did not know in which direction he went. His residence was northwest of the drug store about three hundred yards distant. His farm was west from Longview. He would not pass by his residence in going from the drug store to his farm. Allison and Tabler could not be seen from any of the public streets while they were behind the drug store. Witness did not see the whole of Allison's pistol before he left his drug store, on the fatal morning, but saw the rubber handle of a pistol protruding above the waistband of his pants on the right side. The witness next saw the pistol when Allison's body was taken to his house. Allison was shot within forty-five minutes after he left the drug store. Tabler returned to the drug store after the shooting.

Cross examined, this witness said that, after the shooting of Allison, he discovered a package in the drug store which he did not think was in the store when he opened on that morning. It remained there for a month after the killing. The witness did not know who left the package in the store, nor did he know who took it away. The witness saw Allison, the defendant and another man at the rear of the drug store, on the outside, on election day, in November, 1884. He heard the defendant at that time say that Allison would repent. Allison said nothing in reply that the witness heard, and walked off towards the court house. The witness heard other parties talking after Allison went to the court house, but closed the door without observing who they were. The witness did not see that defendant did anything on that occasion, nor did he then notice defendant's hands.

On his redirect examination, the witness said that the package referred to by him contained nails. He could not remember whether or not he mentioned the package in his testimony on the habeas corpus trial. He did not observe from Allison's demeanor on election day whether he was in a good or bad humor. Allison [Tillery ?] spoke as though he was in earnest, and not in the best of humor. Allison replied: "All right." He did not say "O. K." Tillery used the word "repent," according to the best of witness's recollection, though the word may have been "regret." Witness did not think that he stated on the habeas corpus trial that the word used by defendant was "regret."

A. A. Killingsworth testified that he was sheriff of Gregg county at the time of the homicide. He heard nothing of a vigilance committee until after the killing of Allison. The defendant came to witness's house in February, 1885, after the indictment for the murder of Allison was returned against him, and voluntarily surrendered to the witness.

Mrs. Fidelia Kilgore testified, for the defense, that she was the wife of County Judge John T. Kilgore, and lived with him at his house in the town of Longview on the day of the homicide. On the morning of that day, before the shooting occurred, the defendant came to Judge Kilgore's house, and spent perhaps thirty minutes in conversation with the judge. Witness did not hear the conversation, but heard the defendant, as he left, tell Judge Kilgore that he would be back on the next morning, to which remark Judge Kilgore replied: "If that piece of business is reached before you get back, I will attend to it for you." The county commissioners court was sitting that week. Allison was killed a few minutes after the defendant left. Judge Kilgore's house occupies the location in Longview indicated on the plat in evidence. When the defendant left he went towards the public well. Judge Kilgore had died since the killing of Allison.

Miss Lillie Kilgore, the daughter of the previous witness and Judge Kilgore, testified, for the defense, that she was present and heard the conversation between her father and defendant on the morning of the fatal day. They talked about the change in a public road desired by the defendant.

John W. Mattox was the next witness for the defense. He testified that he was residing in the town of Longview at the time of the homicide, and was clerking for Brown & Flewellen, who conducted business at that time in the Flanagan building,

across the railroad from the depot. The witness, at that time, was a member of a secret organization, known to the members as "the vigilance committee," which was organized some months prior to the killing of Allison. About thirty men belonged to that organization at one time or another of its existence. A simple oath to keep secret the proceedings of the meetings was administered to and taken by the members. Bob Brown administered the oath to witness. Doctor Allison joined the organization after the witness did. The witness attended a meeting of the committee at Doctor Allison's residence on the night before the homicide. Allison notified witness twice on that day to attend that night, as important business would be brought before the committee. Witness attended and found Doctor Allison, George Tabler, John Jennings, and W. T. Whitelock at the meeting. When Allison notified the witness to attend the meeting, he said that he had previously called a meeting of the committee, but that nobody but Tabler attended. Witness and Jennings went to the meeting together, arriving between eight and half past eight o'clock. When the meeting was called to order, Doctor Allison reported to the committee that he and defendant had a difficulty on election day; that defendant caught the lapel of his, Allison's, coat, and said to him that he, defendant, had heard that he, Allison, had denounced him, defendant, as unworthy the consideration of a gentleman. Allison then said that Tillery was going to kill him, but he, Allison, was not afraid of any one man. He then produced and flourished a pistol to display his skill in handling that weapon. Some one of the committee then suggested that a meeting of citizens be held at the opera house at ten o'clock on the next morning. Allison objected that the next day would be too late, and he may have said: "Now is the time." Witness did not distinctly remember what terms he used at that time. The witness had no recollection of remarking to Whitelock, as they left that meeting, that Allison was trying to draw the committee into his private difficulties. Witness did not know what the special object of the meeting was that night. Allison and George Tabler were the conspicuous leaders of the meeting that night, but Jennings had a few words to say. Witness did not remember his reason for taking no part. He did not learn that Allison's difficulty with defendant would be brought before the meeting until he reached Allison's house. In his speech Allison said that "something ought to be done to-night; to-morrow may be

too late." Mr. DeGraffenreid was the first person whom witness told of that meeting. He told DeGraffenreid about six months after the death of Allison. Witness denied any knowledge of the meeting when DeGraffenreid first questioned him about it. DeGraffenreid, however, said that he knew all about it. Witness thereupon exacted a promise from DeGraffenreid not to place him on the witness stand, which promise being given, he told DeGraffenreid all about it. Witness attended but three meetings of the committee. He never heard the Tillery case discussed in the committee but the one time mentioned. The committee was not organized to adjudicate the troubles of Allison and Tillery. Its original purpose was to suppress burglary and petty stealing that was prevalent in town. It never had a meeting after the killing of Allison. The committee operated by notifying suspected parties to leave town. Witness did not know what would have been the consequences to parties notified who disobeyed the notice. George Hanna, Fenner Evans and a negro, all suspected parties, were notified to leave Longview, and they left. After the parties named left town, no more burglaries and thefts were committed. Tillery was never notified to leave.

On his cross examination, the witness stated that his obligation not to divulge the proceedings of the committee kept him from telling of the meeting at Allison's. Good citizens of Longview were members of that committee. Bob Brown, who was a good citizen, was a member. The committee had never proposed to kill anybody. The witness declared that he had told honestly and truthfully all that transpired at the meeting at Allison's house, as he remembered it. The prosecuting counsel at this point propounded the following interrogatory to the witness: "Don't you know that no proposition was made in that meeting to go and kill defendant that night?" The witness replied: "Allison and Tabler were both mighty bitter against the defendant." Allison did not use the word "assassinate" on that night. He did not say that he had been warned that Tillery would kill him. He said that he had met Tillery and his, Tillery's, brother at the back of his drug store on election day. He did not say that Tillery's brother had his hand in his pocket. He did not say that the defendant threatened him. He said that he pulled loose from the defendant and told him that a more public place would suit better for the settlement of the difficulty, and that they would meet some other day. He did not say that he was afraid of being

assassinated by the defendant. He did say that he was not afraid of any one man, and that he could handle a pistol as deftly as any one man. The witness did not know the state of feeling existing between the defendant and Allison until the meeting at Allison's house. He had never heard of the defendant being charged with the burning of Allison's store. No proposition was made in that meeting to notify Tillery to leave Longview. Tabler was killed in Marshall some time after the killing of Allison.

W. T. Whitelock testified, for the defense, that he was a member of the vigilance committee, organized long before the killing of Doctor Allison. The purpose of that organization was to aid the officers in breaking up burglary and theft. On the day before Allison was killed, George Tabler told witness that there would be an important meeting of the committee that night at Allison's house. Witness had not met with the committee for three months, and attended that night through pure curiosity. When he arrived at Allison's house, only George Tabler and Allison were there. Jennings and Mattox came in later. Allison organized the meeting, and said to the members present: "You have all heard how I was treated on election day by Jim Tillery." Some one present replied: "Yes; and something must be done at once or Doctor Allison will be hurt." The objection was then interposed that there were not a sufficient number of the committee present to do anything. It was then stated by some one that a sufficient number of the committee were not present to do anything. This objection was met by the suggestion that enough of the boys about town could be enlisted, and the proposition was made to "go for Tillery." Witness would say that the express purpose of the proposition was to "protect Allison by 'going for' Tillery and his brother on that night." Witness ridiculed the idea of "us old bearded men sitting here by the fire proposing to get a lot of boys to do our dirty work." By "dirty work" the witness meant the proposition to "go for Tillery." George Tabler made the proposition to "go for Tillery." The proposition was received in silence until the objection was interposed that there were not a sufficient number of members present. But little was said after the witness made the remark about dirty work. It was then decided that a meeting of good citizens of the town would be called at the opera house on the next morning. Some one asked Allison if he was prepared to meet danger. Allison replied that he was, and produced a pistol. Witness and Mattox soon left, leaving Tabler, Jennings and Allison at the

latter's house. Doctor Allison displayed no excitement on that night, and did not exhibit any fear or uneasiness. The meeting was held in Allison's parlor, with the doors, blinds and windows securely fastened to keep the proceedings from being seen or overheard by anyone. The witness was absolutely certain that the motion to "go for Tillery" was made by either Tabler or Allison.

Continuing his testimony, the witness stated that the oath taken by the members of the vigilance committee was not to divulge the proceedings, or any of the secrets of the body. The organization was effected a considerable time before the killing of Allison. Allison joined it about two months before his death. Tabler was one of the original members. The witness would not have attended the meeting at Allison's had he known that the proposition to "go for Tillery" was going to be submitted. The witness first told the details of the meeting at Allison's to Mr. DeGraffenreid, the defendant's attorney. When DeGraffenreid first spoke to witness about the meeting, witness told him that no such meeting had taken place. When the existence of the vigilance committee was actually made public, it created a sensation. In view of the oath taken by the members, the witness considered the exposure of the committee's existence an outrage. Witness was one of the first persons to join the organization and take the oath. The organization was more than two months old when Doctor Allison joined it. Tabler's hotel was about three hundred yards from the business part of town. The witness attended regular meetings of the committee after the burning of Butt's house, in July or August, 1884. Witness heard Tabler and Allison mention Tillery's name in the meetings in connection with the burning of Allison's store. Allison's unsupported word, and no evidence whatever, was presented to sustain the charge against defendant. Allison insisted that Tillery was a bad man. The defendant had lived in Longview about fourteen years at the time of the homicide, and had then been married about a year. He was then farming, but had been previously engaged in the grocery business with either Killingsworth or Stevens. He sold his interest in the grocery store to Killingsworth, two or three months before Allison's house was burned. Witness did not know when nor how DeGraffenreid first heard of the meeting of the vigilance committee at Allison's house. Witness understood the motion to "go for Tillery" to mean to "wipe him, Tillery, out of existence." Witness with-

drew from the committee that night, because its objects were being overruled, and Doctor Allison's private quarrels and animosities were being dragged in for adjudication by the committee.

On his cross examination, the witness stated that he could not possibly be the friend of the defendant and Stevens and attend the meetings of that vigilance committee. The witness considered that he was bound to secrecy about the committee from the moment he took the oath. No other motive than curiosity prompted him to attend the meeting at Allison's house. The witness could not recollect that Doctor Allison ever said, at any of the meetings, that he had collected evidence enough to convict the defendant of burning his houses. Witness heard Allison say that he was afraid of being killed, but that he was "not afraid of one of them." The prosecuting counsel asked witness: "Didn't you hear Doctor Allison say that he had proof on which he could indict and convict defendant and Stevens?" The witness answered: "Can't recollect." Question: "Did he say that he had collected and had evidence enough to convict the defendant?" Answer: "Can't recollect. Don't know that he ever, at any meeting, said any such thing. What Doctor Allison said grew out of the burning of his houses."

Continuing, the witness said that he could not distinctly remember that Doctor Allison ever said that he was afraid of assassination, though he thought the word "assassination" was used. The witness did not understand the proposition to "go for Tillery" to mean that Allison and Tabler were to "go for him" on the evidence collected by Allison. The witness quit the committee because he thought it was the business of Allison and his friends to interest themselves in Allison's private grievances, and not his, witness's, business. The vigilance committee was originally organized to aid the officers in breaking up an epidemic of burglary. Allison had a store house and a barn burned. Doctor Allison, at every meeting, appeared to witness to be uneasy. Witness once heard him say that he was not afraid of "them" if "they" would give him a show. Witness did not know whether or not Allison ever had any evidence against defendant for burning his houses. The witness did not think that Allison really believed that defendant burned his houses. Before the suit between Butt and Killingsworth on some rent notes, the defendant and Doctor Allison were on friendly terms.

John Kilgore testified, for the defense, that he was employed

in the telephone office in Longview at the time of the homicide. A short time before the tragedy Doctor Allison signaled the witness to connect him with Tabler. Witness did so, and waited some time for Allison to ring off. He finally concluded that they had finished their conversation and had forgotten to ring off. He then took up the telephone to ascertain whether or not they were through, and heard Doctor Allison tell Tabler to come down town soon, and that somebody would be hurt, Witness did not hear Tabler's reply, as he put the telephone down immediately on ascertaining that they had not quit talking. Witness soon started home, and was sitting at the market house with Mr. Robinson's little son when the shooting took place. While witness was sitting there the defendant passed him, going from witness's father's house towards town. The telephone office was then over Bevins's store, opposite Jennings's drug store.

The testimony of Tom Turner, as delivered on the habeas corpus trial of the defendant, and reduced to writing was, at this point, read in evidence by the defense. It reads as follows:

"I was in Longview the day Doctor Allison was killed. I live in Gregg county, and have lived there since the first of last January. I saw the killing. I was walking on the sidewalk. Tillery was riding in front of Doctor Allison. Doctor Allison rode up and passed Mr. Tillery, and spoke to him. He pointed back over his shoulder and said: 'Do you see that brick there?' pointing to where there was a burned building on the corner. Tillery said: 'What do you mean?' Allison said: 'I mean that I believe you had a hand in burning my house.' Allison by this time had checked his horse, and Tillery was riding towards him. Tillery said: 'You must retract things you have said.' Doctor Allison turned himself in his saddle, throwing his hand to his belt under his vest, and said: 'I retract! Never!' When he did that, Tillery raised his pistol up and fired. Doctor Allison did not get his pistol out. I only saw the handle of the pistol, and don't know if it was a whole pistol. Tillery fired three shots."

Doctor W. L. Marshall testified, for the defense, that some time after the burning of Allison's store, Allison came to his house, and, in the course of a conversation, asked witness: "What would you do if a person was to burn your house?" Witness replied: "I would take him out and hang him." Allison then said to witness: "Come down and join our club." Witness's wife appeared upon the scene, and the conversation was brought to an abrupt close.

W. R. Bass testified, for the defense, that he joined the Longview vigilance committee in the summer of 1884. The last meeting he attended was some six weeks before the killing of Allison. He quit the committee because some of the members were in favor of taking the defendant and Stevens out and hanging them. That purpose was resisted by other members. Doctor Allison said that the defendant and Stevens burned him out, but offered no evidence before the committee to sustain the charge. Others besides the witness quit attending the meetings because of the disposition to take up the Allison-Tillery quarrel. Witness was not at the meeting at Allison's house on the night before the homicide. Defendant's reputation for honesty was good.

On his cross examination, the witness testified, that Doctor Allison never told the meeting that he had evidence enough to indict and convict defendant and Stevens for burning his house, but was afraid of losing his life by taking up the prosecution. He simply said that they burned his house, and he wanted the committee to take them out and hang them. Allison said that he was afraid defendant and Stevens would kill him for the manner in which he had pursued him. Allison and Tabler were the only two members of the committee who advocated the hanging of the defendant and Stevens. The other members resisted the purpose. At the time of the burning of Allison's houses, one of them was occupied by Killingsworth, and one by Allison himself. The defendant did not kill George Tabler.

H. D. Booth testified, for the defense, that he was city marshal of Longview at the time of the killing of Doctor Allison. He never heard of the existence of a vigilance committee in that town until after the killing of Doctor Allison. The defendant had always sustained a good reputation in Longview for honesty and fair dealing.

T. M. Campbell testified, for the defense, that, in connection with his business as a lawyer, he was, at the time of the killing and before, acting as an insurance agent in the town of Longview. He carried all of the insurance on Allison's houses and stock. Allison's stock was insured with witness for five thousand dollars, and his store houses for two thousand five hundred dollars. Two store rooms in Allison's building were burned, and Allison was paid by the insurance companies one thousand two hundred dollars on each, making two thousand four hundred dollars. About one thousand one hundred dollars.

worth of Allison's stock was saved, and the sum of three thousand two hundred and fifty dollars was paid him for losses on stock. Butt's house and household goods, which were also burned, were insured with witness for one thousand three hundred and fifty dollars. The defendant and Stevens sold out their stock of groceries to Killingsworth & Co. (Mrs. Killingsworth being the "Co.") about November 3, 1883. The witness's recollection on this point was correct, because he transferred the insurance of Stevens & Tillery on the stock to H. B. Killingsworth & Co. Witness was familiar with the facts involved in the litigation between Butt and Killingsworth. The suit was based upon rent notes of thirty dollars each per month in advance for the year 1884, for the rent of one of the houses that was burned. The said notes were originally executed by Killingsworth to Doctor Allison, and by him were transferred to Butt. Doctor Allison was, however, the real party plaintiff in the suit, and owned the notes when the suit was filed. The defendant was subpoenaed as a witness in that case for Killingsworth. After investigating the facts in the case, the witness told Butt and Allison that they could not recover on Butt's suit on the notes, as he took the notes advised of the facts and the defense of failure of consideration. Witness then dismissed the suit. On the evening after the suit was dismissed, Doctor Allison came to witness and said that he was satisfied that Newt [Stevens ?] fired his house, and that if he could work a scheme to collect the rent he would do it. Witness, at that interview, told Doctor Allison that Tillery, the defendant, had said that he, Allison, was merely using Butt as a tool in that litigation. Allison then said that he believed the defendant had a part in burning his house, which was the first time witness ever heard defendant's name connected with the house burning. The said suit was dismissed in May, 1884. The loss of the suit made Doctor Allison furiously angry. Allison never mentioned defendant's name to witness in connection with the burning of the houses until after the Butt-Killingsworth suit was dismissed, which was some five months after the fire, during which time witness and Allison prosecuted an investigation into the cause of the fire. Killingsworth carried two thousand dollars insurance on the stock he bought from Stevens & Tillery, and after the fire, collected between seven hundred and fifty dollars and one thousand dollars from the insurance companies on losses. Allison and witness were in constant

communication, and operated together in their efforts to discover the parties who fired the stores, or the cause of the fire. Witness first heard of the vigilance committee after Allison's death.

W. F. Nelson testified, for the defense, that he met Doctor Allison and John Mattox about seven o'clock on the evening before the killing. They observed the defendant and James Taylor talking together. Some one mentioned the defendant's name, when Doctor Allison said: "Don't mention Tillery's name to me." In the same connection Doctor Allison said that he would "fix" the defendant before morning. Witness saw defendant a short time after that and told him what Doctor Allison had said. Defendant laughed and said: "Doctor Allison has not got nerve enough."

Several witnesses for the defense testified that they knew the defendant's reputation for honesty and fair dealing, and that it was good. Others testified that George Tabler attended the habeas corpus trial of the defendant, but was not introduced as a witness by either party. Tabler, subsequent to the killing of Doctor Allison, killed Jeff Teague, the prosecuting attorney of Gregg county, who was then prosecuting this defendant, and was afterward's killed by Teague's father and brother. Doctor Allison was about fifty years old at the time of his death, was nearly six feet tall, would weigh about one hundred and sixty-five pounds, and was well preserved. The State admitted that, on the day of the homicide, the wife of the defendant was at home, sick in bed, and had a child but one week old.

The defense closed.

Mrs. J. R. Allison, the wife of the deceased, testified, for the State, that soon after the deceased went to town, on the morning of the homicide, he came back home and told the witness that he was going out to his farm, and that he had to go by the drug store to get a package of nails he had left there. He then left home, and within a little while was brought back dead.

The motion for new trial raised the questions discussed in the opinion.

*J. M. Duncan, Alex Pope, R. C. De Graffenreid* and *T. M. Campbell,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WILLSON, JUDGE. I. There can be no question but that the evidence in this case fairly and fully raises the issue of self defense. It clearly appears that the deceased had, for some time previous to the fatal rencounter, been at enmity with the defendant; had repeatedly, and apparently without reasonable or probable cause, charged the defendant with the crime of arson; had threatened to take the life of the defendant; had actually conspired with one Tabler to take defendant's life, and was acting together with said Tabler at the very time of the homicide, in pursuance with and in furtherance of said conspiracy. He and Tabler also endeavored to induce others to enter into said conspiracy with them, under the guise and protection of an oath bound, secret organization called a "vigilance committee."

On the night before the homicide, at the instance of the deceased and Tabler, a meeting of this "vigilance committee" was held at the residence of deceased, at which it was proposed and urged by deceased that the committee should proceed at once, on that very night, to execute the defendant, but none of the committee present would agree to this proposition except Tabler. Early on the next morning, just before the homicide, deceased went to his place of business, and through the telephone summoned Tabler to his presence. Tabler responded promptly, and the two had a private conference. Very soon after this conference the deceased, mounted upon his horse, and armed with a six shooter, rode up by the side of defendant, who was riding along a street in the town of Longview, and, after accosting him, again accused him of the crime of arson, and it was here that he received the fatal shot at the hands of the defendant.

We do not think it can be doubted, from the evidence before us, that the deceased and Tabler had resolved upon taking the life of the defendant at the first favorable opportunity; that they were prepared for and seeking such opportunity; and that, on the occasion of the homicide, the deceased provoked the difficulty which resulted in his death, with the intention at the time of killing the defendant. By the evidence we are fully informed of the condition of the mind of deceased towards the defendant, and as to his intentions and design to wreak vengeance upon him in a deadly manner. He is surrounded by a halo of light, discovering his malice and inward intention, and illustrating his acts.

How stands the case with the defendant? His presence in

town in the early morning is satisfactorily accounted for; he was there on a matter of business with the county judge. At home he left a sick wife with an infant only one week old. He has attended to his business with the county judge, and, mounted upon an inferior pony, is traveling along a public street. On the night previous he had been informed that the deceased had threatened on that very night to "fix" him before the next morning. He was well aware of the bitter enmity of the deceased towards him, although he may not have known of the conspiracy between deceased and Tabler to take his life. He was armed with a pistol, and, in view of the threat which had been communicated to him the night previous, it can not be said that the fact of his being thus armed indicated anything more than that, should occasion require, he would defend himself against the threatened danger. There is nothing whatever in the evidence to indicate that he was seeking a difficulty with the deceased. Under these circumstances, the deceased rode up from behind, beside the defendant, and, accosting him, accused him again of the crime of arson. Defendant responded that he must retract the charge. Just then, one witness testifies, the deceased, who had ridden a little in advance of the defendant, turned in his saddle towards defendant, and placed his right hand to his right side as if to draw a pistol, when the defendant fired and shot him. A pistol was found on the body of deceased, on his right side, about where the witness saw him place his right hand. Upon this evidence the trial judge very properly submitted to the jury the issue of self defense.

It is earnestly contended, however, by counsel for the defendant, that the charge upon said issue is imperfect, erroneous and prejudicial to the defendant, and should have been supplied and corrected by special instructions requested by the defendant. Considering the charge on self defense with reference to the evidence bearing upon that issue, we are of the opinion that the objections urged to it are substantial and tenable. There is not a particle of evidence fairly raising the issue that defendant had forfeited the right of self defense by seeking and provoking the difficulty, and it was erroneous and prejudicial to the defendant to submit that issue to a jury.

In instructing the jury upon the law of *apparent* danger, the charge makes the right of self defense hinge upon the fact as to whether or not the defendant *honestly* believed at the time he acted that he was in danger of losing his life, etc. This idea of

*honest belief* on his part is presented three several times in the charge upon self defense; and, while being subject to the objection that it is made too prominent to the minds of the jury, is besides not a correct statement of the law. The correct rule is that, if it *reasonably* appeared to the defendant, from his standpoint, from the circumstances of the case, that the danger existed, and he acted under the reasonable belief that it did exist, he was justified in defending against it to the same extent and under the same rules permitted in case the danger had been real. (Willson's Texas Crim. Laws, sec. 978.) While it may be abstractly correct to require that the defendant's belief of the existence of danger should be an *honest* one, it is going too far, we think, to so instruct the jury, especially when such instruction is repeated so often, and especially, too, in view of the evidence in this case.

Another serious objection to the charge is that, in instructing the jury in relation to threats made by the deceased against the defendant, this portion of the charge is disconnected from that portion relating to self defense, when it formed a part of the law of the issue of self defense, and should have been given in immediate connection therewith. In the position in which the instruction as to threats appears in the charge, the jury might reasonably have concluded that it had no connection with the issue of self defense, and the effect may have been that, in considering that issue, the jury entirely ignored the legitimate bearing of the threats thereon. The law of self defense, when invoked by the proof, should be given to the jury plainly, directly, connectedly and affirmatively, and in such manner as to show its applicability to the facts in evidence.

In this case, the facts in proof upon the issue of self defense are not complicated, and a plain, direct, affirmative explanation of the law applicable thereto should have been given. We do not think the court gave such a charge, and the failure to do so was, we think, calculated to, and probably did, injuriously affect the defendant's rights. Defendant's guilt or innocence hinged solely upon self defense, and it was all important to him and to justice that the law in relation to that issue should be fully and clearly explained to the jury. The learned trial judge evidently desired and intended to perform this duty, but, as we have attempted to show, in material particulars failed to give the defendant the full benefit of self defense, and such failure, in view

of the evidence in this case constitutes error for which the judgment must be reversed.

II.  Whilst, in our opinion, it was competent for the defendant to prove, if he could, that the deceased had no probable cause for charging him with the crime of arson, and that deceased did not in fact believe said charge to be true, but that the cause of deceased's enmity towards him was an entirely different matter than the arson, still, we do not think the court erred in refusing to permit the witness Campbell to answer the question propounded to him, as to whether, in an investigation he had made about the arson, he had found any evidence tending to connect the defendant with it.  The objection made to the question was that the answer thereto would be but the conclusion of the witness.  This objection, we think, was properly sustained.  If the witness had been called upon to state facts within his knowledge concerning the arson, and the defendant's relation to those facts, such testimony would have been relevant and admissible in view of the other evidence in the case.

III.  It was not error to reject the proposed testimony of the declarations of Tabler.  Said declarations were made some time after the homicide, and were not a part of the *res gestæ* of the homicide.  They were hearsay.  The fact that Tabler was a co-conspirator with the deceased in seeking to take the life of the defendant would not render such declarations admissible in behalf of the defendant.  If the deceased or Tabler had been on trial for a crime committed in furtherance of such conspiracy, then the declarations of one, made pending such conspiracy and in furtherance thereof, would be admissible against the other. (Willson's Texas Crim. Laws, sec. 1048.)  But we know of no rule of law which would render admissible in behalf of the defendant the declarations of Tabler, made after the commission of the homicide.

IV.  In his closing argument to the jury, counsel for the State went out of the record, in speaking of Tabler, to tell the jury about the circumstances of Tabler's death—the manner in which, by whom and for what cause said Tabler had been killed, and why it was, and how it was that Tabler had killed one Teague, and several other matters in relation to said Tabler, about which there was no evidence.  Counsel for defendant promptly objected to these remarks, and the court overruled the objection, appending to the bill of exceptions his reasons for so doing, which are that defendant's counsel had, in their address to the jury, severely

denounced, as a coconspirator with the deceased, the said Tabler, etc. As shown by the evidence in the case, counsel for the defendant were justified in so denouncing said Tabler, and in so doing were but reproducing the evidence adduced on the trial. Counsel for the State was not, therefore, warranted, in reply to this legitimate denunciation, in stating to the jury his individual knowledge of Tabler, and recounting to them the circumstances of the killing of Teague by Tabler, and the subsequent killing of Tabler by the father and brother of the deceased Teague. These matters were wholly foreign to the case on trial, without any support whatever in the evidence, and were calculated to operate upon the minds of the jury prejudicially to the defendant. These improper remarks, if there was no other error apparent in this record, would. justify, if not demand, a reversal of the judgment.

V. A number of other errors are assigned, which we shall not discuss or determine, as they are of that character which are not likely to occur on another trial. Because of the errors in the charge, and the improper remarks to the jury made by counsel for the State, above mentioned, the judgment is reversed and the case is remanded.

*Reversed and remanded.*